David S. Casey, Jr. (SBN 60768)
Gayle M. Blatt (SBN 122048)
P. Camille Guerra (SBN 326546)
**CASEY GERRY FRANCAVILLA BLATT LLP**
110 Laurel Street
San Diego, CA 92101
Tel: (619) 238-1811
dcasey@cglaw.com
gmb@cglaw.com
camille@cglaw.com

Joseph J. DePalma (*pro hac vice forthcoming*)
Catherine B. Derenze (*pro hac vice forthcoming*)
**LITE DEPALMA GREENBERG & AFANADOR, LLC**
570 Broad St., Suite 1201
Newark, NJ 07102
Telephone: (973) 623-3000
Facsimile: (973) 623-0858
jdepalma@litedepalma.com
cderenze@litedepalma.com

*Counsel for Plaintiff and the Putative Class and Subclass*

[Additional Counsel Listed in Signature Block]

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| TAYLOR DALORA, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>DEXCOM, INC.,<br><br>Defendant. | Case No. **'25CV3210 WQHBJW**<br><br>**CLASS ACTION**<br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiff Taylor Dalora, individually and on behalf of all others similarly situated, alleges the following based on her personal experience and her counsel's investigation.

## I. NATURE OF ACTION

1. It's 3:00 am. An individual with diabetes jolts awake—dizzy, sweaty, trembling, and confused. To ensure real-time monitoring of their blood-glucose levels, they wear a medical device called a continuous glucose monitor, which is designed, manufactured, and marketed by Defendant Dexcom, Inc. That monitor, also known as a "CGM," maintains constant readings of blood glucose and transmits the reading to an app on the person's phone. They open Dexcom's green-and-white app to get a blood-glucose reading.

2. Dexcom's app says the user's blood glucose is 97 mg/dl (milligrams per deciliter)—a normal reading that would not prompt the app to alert its user that a corrective treatment is necessary. But, because their symptoms tell a different story, the user pricks their finger and tests their blood using a traditional meter for measuring blood glucose called a glucometer. The glucometer reads 40 mg/dl. This not only reveals a severe discrepancy between the CGM's reading and the glucometer's measurement of the blood glucose level, but the lower reading indicates the user has hypoglycemia, a potentially life-threatening condition. Precious minutes have now been wasted questioning Dexcom's reading before administering necessary treatment. This frightening scene is not isolated; it reflects a recurring accuracy failure in Dexcom's CGMs -- the G6 and G7 sensors.

3. Those failures trace directly to a design change that Dexcom made without notifying federal regulators. In December 2023, Dexcom replaced a third-party-manufactured silicone-based resistance-coating component of the sensor filament in their CGMs with a cut-rate, in-house formulation (the "Substitute Component"). Dexcom made this modification without submitting a premarket notification to the FDA, even though the FDA characterizes this coating as "critical" to sensor performance. Dexcom G6 and G7 sensors with the Substitute Component are referred to herein as "Modified CGMs." Dexcom's own validations showed that the Substitute

Component performed worse and with greater variability than the FDA-approved G6 and G7 CGMs.[1] And in March 2025—following surprise inspections of Dexcom's Mesa, Arizona and San Diego, California facilities by federal regulators—the FDA issued a Warning Letter finding that the Modified CGMs were "adulterated" and "misbranded" and concluding that the unreported change required new premarket approval.[2]

4. Accuracy in CGMs like the G6 and G7 sensors is critical for individuals with diabetes. Blood glucose readings guide split-second treatment decisions for those individuals and, for some, drive automated insulin delivery through insulin pumps—devices that automatically administer insulin to their users. After Dexcom's undisclosed and unapproved change, accuracy complaints about these CGMs surged in the FDA's MAUDE database – a database reflecting reports of adverse events involving medical devices – and users publicly reported mismatches between Dexcom readings and confirmatory fingersticks. These signals were later echoed by the FDA's findings that Dexcom's design verification, validation, and risk analyses were inadequate for real-world conditions.

5. Dexcom did not merely ignore these red flags and their safety implications for users. Rather, they continued to market the Modified CGMs as "FDA-approved," "the most accurate," and requiring "no fingersticks." Defendant marketed its sensors through national television, online advertising, product packaging, and physician outreach.

6. Defendant's misrepresentations concerning the accuracy and FDA-approval of the Modified CGMs are deceptive, misleading, and/or false. Defendant continues to wrongfully induce patients, and their caregivers, to purchase the Modified CGMs.

---

[1] https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/dexcom-inc-700835-03042025

[2] *Id.*

7. Defendant's misrepresentations allowed it to capitalize on, and reap enormous profits from, reasonable patients and their caregivers who overpaid for the Modified CGMs and did not receive the benefit of their bargain.

8. Plaintiff relied on the representations described above and other representations by Dexcom about the sensors' performance and convenience, paid for sensors that were not as represented, and received devices that the FDA deemed adulterated and misbranded, suffering economic loss.

9. Plaintiff brings this action on behalf of herself and a putative class to stop Dexcom's unlawful, unfair, and fraudulent practices; to obtain restitution, disgorgement, and damages; and to secure injunctive relief prohibiting Dexcom from selling or advertising modified G6 and G7 sensors as "FDA-approved" or "accurate" absent premarket authorization.

## II. JURISDICTION AND VENUE

10. This Court has jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). There are at least one hundred members in the proposed class, the aggregated claims of the individual class members exceed $5,000,000, exclusive of interest and costs, and this is a class action in which one or more members of the proposed Class are citizens of a state different than Defendant.

11. This Court has personal jurisdiction over Defendant because Defendant is headquartered in this District, has sufficient minimum contacts with this District, and intentionally avails itself of markets in this District through the promotion, sale, and marketing of its products here.

12. Venue is proper in this District under 28 U.S.C. § 1391 because Defendant resides here and a substantial part of the events, acts, or omissions giving rise to Plaintiff's claims occurred here.

## III. PARTIES

13. Plaintiff Taylor Dalora is, and at all times relevant hereto, a citizen of the state of New Jersey.

14. Defendant Dexcom, Inc. is a Delaware corporation, headquartered at 6340 Sequence Drive, San Diego County, San Diego, California 92121. Dexcom is a medical-device company engaged in the design, development, and commercialization of CGM systems for the management of diabetes. Dexcom sells its devices to millions of individuals with diabetes and, as recently as last year, generated over $4,000,000,000 in annual revenue.

## IV. FACTUAL ALLEGATIONS

15. Dexcom manufactured, distributed, and sold CGMs to individuals with diabetes while marketing these CGMs as "the most accurate" and "FDA-approved." However, in December 2023, without disclosing the modification to the public or FDA, Dexcom implemented a design change to its CGMs that adversely impacted the accuracy of the Modified CGMs.

16. As of 2021, 38.4 million Americans have diabetes, a group of endocrine diseases characterized by sustained high blood glucose levels.[3] Glucose is generally derived from the foods a person consumes and, under normal circumstances, the hormone insulin enables the body's cells to absorb glucose and convert it into energy.

17. Over time, elevated blood glucose levels can cause serious and often irreversible complications throughout the body. Diabetes can damage the eyes; cause nerve damage and reduced circulation to the feet, resulting in infections and, in severe cases, amputations; increase the risk of gum disease, tooth decay, and other dental problems; damage blood vessels and the nerves that control the heart and circulatory system, leading potentially to heart disease and stroke; damage the kidneys; cause nerve damage; and render individuals with diabetes prone to skin conditions and infections due to reduced circulation and immune response.

18. In addition to these long-term complications, individuals with diabetes must vigilantly manage their blood glucose levels, because both dangerously high (hyperglycemia) and low (hypoglycemia) levels can occur suddenly and pose immediate health risks.

---

[3] https://www.cdc.gov/diabetes/php/data-research/index.html

19. ***Hyper***glycemia occurs when an individual's blood glucose level becomes abnormally high (typically above 200 mg/dl). Symptoms of hyperglycemia can include increased thirst, frequent urination, fatigue, blurred vision, and headaches. If left untreated, severe hyperglycemia can lead to serious and potentially life-threatening complications, including diabetic ketoacidosis, in which the body breaks down fat for energy, producing dangerous levels of acids known as ketones in the blood.

20. ***Hypo***glycemia occurs when an individual's blood glucose level drops below the normal range (typically below 70 mg/dl), depriving the body of its primary source of energy. Symptoms of hypoglycemia can develop rapidly and include shakiness, sweating, dizziness, confusion, blurred vision, weakness, and, in severe cases, loss of consciousness or seizures. If untreated, hypoglycemia can become life-threatening.

21. Individuals with diabetes who experience recurrent or prolonged episodes of hypoglycemia may develop a condition known as hypoglycemia unawareness, in which the body no longer produces the usual warning symptoms of low blood sugar. In such cases, a person's blood glucose may fall to dangerously low levels without noticeable physical symptoms. Because individuals with hypoglycemia unawareness cannot rely on their own sensory cues to detect these drops, they are at a heightened risk of experiencing severe hypoglycemic events that require emergency medical intervention.

## A. Blood Glucose Monitoring

22. According to the Cleveland Clinic, "[b]lood sugar monitoring is one of the most important aspects of managing diabetes."[4] Individuals with diabetes can monitor their glucose levels by using a glucometer and blood test strips or a CGM.[5]

23. Individuals with diabetes must regularly monitor their blood glucose levels to determine how well their treatment plans are working. Frequent testing provides critical, real-time information that allows those individuals to manage their condition

[4] https://my.clevelandclinic.org/health/treatments/17956-blood-sugar-monitoring

[5] *Id.*

on a daily—and often minute-by-minute—basis. For those who use insulin, accurate blood glucose monitoring is especially essential, as it helps guide key decisions regarding food intake, physical activity, and proper insulin dosing.

24. Numerous factors can cause fluctuations in blood glucose levels. Blood glucose levels typically rise after consuming carbohydrates, missing or underdosing insulin or other diabetes medications, engaging in less physical activity than usual, taking certain medications, experiencing illness, surgery, or stress, or as a result of hormonal changes. Smoking, dehydration, and puberty can also contribute to elevated glucose levels.

25. Conversely, blood glucose levels may drop when meals are skipped, when excessive insulin or diabetes medication is taken, or following physical activity. Other factors, such as menstruation, alcohol consumption, or the timing of meals and medication, can have varying effects on blood sugar depending on the individual.

26. Because so many variables influence glucose levels, consistent monitoring is vital for individuals with diabetes. Regular testing is the only reliable way to detect changes in blood sugar and enables both patients and their healthcare providers to make necessary adjustments to treatment, diet, and lifestyle to maintain safe and stable glucose control.

27. Individuals with diabetes can monitor their blood glucose levels in several different ways. The first way is using a medical device known as a glucometer (an example of which is pictured in Figure 1). A glucometer measures the amount of glucose in a small sample of the individual’s blood, typically obtained by pricking the fingertip with a sterile lancet. The blood sample is then placed on a disposable test strip that is inserted into the glucometer, which analyzes the sample and displays the individual’s blood glucose level within seconds.



*Figure 1*

28. Individuals with diabetes can also monitor their blood glucose levels using a CGM. A CGM system is designed to measure the glucose levels of individuals with diabetes in real time without the need for routine fingerstick testing. The CGM device consists of a small sensor inserted just beneath the skin, typically on the abdomen or upper arm, which continuously measures glucose levels in the interstitial fluid (the fluid surrounding the body's cells). A diagram reflecting a CGM is set forth below as Figure 2. The sensor transmits glucose readings wirelessly to a receiver or compatible smartphone every few minutes, allowing users to view and track their glucose trends all day.




*Figure 2*

29. CGMs measure glucose concentrations in the body's interstitial fluid through an enzymatic electrochemical process.[6] The device's sensor contains a thin wire coated with the enzyme glucose oxidase, which reacts chemically with glucose molecules present in the interstitial fluid beneath the user's skin to generate hydrogen peroxide.[7] The hydrogen peroxide is then electrochemically oxidized at the sensor's electrode surface, producing an electrical current proportional to glucose concentration.[8] The CGM's transmitter converts this current into a digital signal processed by the CGM manufacturer's proprietary algorithm to display glucose readings on the user's receiver or smartphone.[9]

30. A CGM can be integrated with an individual's insulin pump to create an automated or "closed-loop" insulin delivery system. In such configurations, the CGM continuously transmits its real-time glucose readings to the insulin pump, which uses the GCM's data to adjust insulin delivery based on the reported glucose levels and rate of change. When glucose levels rise, the pump can increase insulin infusion to help bring levels down; when glucose levels fall, the pump can automatically reduce or suspend insulin delivery to prevent hypoglycemia. This connectivity allows for more precise and responsive glucose management than traditional manual monitoring and dosing, reducing the burden on the individual and improving overall glycemic control.

---

[6] Mihai DA, Stefan DS, Stegaru D, Bernea GE, Vacaroiu IA, Papacocea T, Lupușoru MOD, Nica AE, Stiru O, Dragos D, Olaru OG. Continuous glucose monitoring devices: A brief presentation (Review). Exp Ther Med. 2022 Feb;23(2):174. doi: 10.3892/etm.2021.11097. Epub 2021 Dec 28. PMID: 35069855; PMCID: PMC8764584.

[7] *Id.*

[8] *Id.*

[9] *Id.*




*Figure 3*

**B. <u>Dexcom's Continuous Glucose Monitors</u>**

31. Dexcom is a medical device company that specializes in the design, development, and marketing of CGM systems for individuals with diabetes. In 2024, Defendant's annual revenue was $4.033 billion and, globally, it had 2.8 million customers.[10]

32. Founded in 1999, Dexcom introduced its first CGM system in 2007 after receiving U.S. Food and Drug Administration ("FDA") approval.[11] Since then, Dexcom has released successive generations of CGM monitors, including the G6 and G7, each marketed as offering improved accuracy, convenience, and connectivity.[12] Over the past two decades, Dexcom has become one of the leading manufacturers of CGMs worldwide, promoting its products as essential tools for diabetes management and integrating them with digital health platforms, smartphones, and insulin pump systems.

33. Millions of individuals with type 1, type 2, and gestational diabetes are Dexcom G6 and G7 CGM users. Type 1 diabetes is an autoimmune disease in which the body's immune system destroys the insulin-producing beta cells in the pancreas,

---

[10] See Dexcom's 2024 Annual Report, available at https://s201.q4cdn.com/758408164/files/doc_financials/2024/ar/dexcom-2024-annual-report.pdf (last accessed Nov. 5, 2025).

[11] https://www.dexcom.com/en-GB/about-dexcom

[12] *Id.*

causing a lifelong dependence on insulin injections to regulate blood glucose levels. Type 2 diabetes is a chronic metabolic disorder characterized by the body's resistance to insulin or insufficient insulin production, resulting in elevated blood glucose levels over time. Gestational diabetes develops during pregnancy when hormonal changes cause the body to become resistant to insulin, leading to elevated blood glucose levels that can impact both the mother's and baby's health if not property managed.

**1. The Dexcom G6**

34. Medical devices regulated by the FDA are classified into either Class I, Class II, or Class III, based on their potential risk to patients and the level of regulatory oversight required to ensure safety and effectiveness. *See* 21 U.S.C. § 360c(a)(1). Class I devices present only minimal potential for harm to the user and are therefore subject solely to the FDA's general controls, which include manufacturer registration, device listing, compliance with Good Manufacturing Practices under the Quality System Regulation (21 C.F.R. Part 820), truthful labeling, and the reporting of adverse events. An example of a Class I medical device is a stethoscope.

35. Class II devices, by contrast, present a greater degree of risk to the patient and require heightened FDA oversight to provide reasonable assurance of safety and effectiveness. In addition to the general controls applicable to all devices, Class II products are subject to postmarket surveillance requirements imposed by the FDA.[13] According to the FDA, "[p]ostmarket surveillance is the active, systematic, scientifically valid collection, analysis, and interpretation of data or other information about a marketed device. The data collected under a surveillance order help to address important public health questions on the safety and effectiveness of a device."[14]

36. Defendant launched the original Dexcom G6 in 2018 after the FDA approved it as a Class II medical device.[15]

---

[13] https://www.fda.gov/regulatory-information/search-fda-guidance-documents/postmarket-surveillance-under-section-522-federal-food-drug-and-cosmetic-act

[14] *Id.*

[15] *Id.*

37. All iterations of Dexcom's G6 system consist of three main components: a sensor, a transmitter, and a receiver or compatible smart phone. The sensor is a small filament housed within a plastic applicator, designed to be inserted just beneath the skin where it continuously measures glucose levels in interstitial fluid. The G6 sensor is typically placed on the abdomen. The G6 applicator is a one-button device that inserts the sensor into the body. Once inserted, a small adhesive patch holds the sensor in place, and the transmitter, attached to the top of the sensor, wirelessly sends glucose readings at regular intervals to the receiver or smartphone app.




*Figure 4*

38. The Dexcom G6 is designed "to be used continuously for up to 10 days, after which it may be replaced with a new disposable sensor."[16] It is also designed to integrate with several insulin pumps, such as the Tandem t:slim X2 and Omnipod 5, to create automated insulin delivery (AID) systems that use real-time CGM data to adjust insulin doses. [17]

39. When Defendant announced that the Dexcom G6 had received clearance from the FDA via the De Novo process (a FDA pathway for novel, low- to moderate-risk medical devices that do not have a pre-existing, legally marketed predicate device

[16] https://www.dexcom.com/en-us/g6-cgm-system

[17] https://www.dexcom.com/g6-icgm

to compare against)[18], it declared that this product would "eliminat[e] the need for fingerstick blood testing for people with diabetes."[19] Dexcom represented that the G6 is a "factory-calibrated, real-time CGM system with exceptional accuracy," that users "will no longer be required to prick their fingers for diabetes management," and "Fingerstick Elimination – No fingersticks are needed for calibration or diabetes treatment decisions."[20]

40. These representations have continued in Defendant's current marketing materials for the G6 sensor. Defendant promotes the Dexcom G6 as "the first real-time CGM" on the market[21] that had "proven accuracy"[22] and gave users "the freedom to manage . . . diabetes with zero fingersticks or calibrations."[23] Indeed, repeatedly Dexcom emphasizes in its promotional materials that there would be "[n]o fingersticks," that the G6 "sends real-time glucose readings automatically to a compatible smart device or Dexcom receiver," and that the G6 gives users "the power to make informed decisions in the moment without stopping to prick your finger."

41. Dexcom also reported that the G6 had "[e]xceptional accuracy" because it had an overall Mean Absolute Relative Difference ("MARD") of 9.0%.[24]

42. Dexcom and other CGM manufacturers routinely report and rely on MARD to represent device accuracy. MARD measures the average percentage difference between a CGM's glucose readings and laboratory-reference values and is

---

[18] https://www.fda.gov/medical-devices/premarket-submissions-selecting-and-preparing-correct-submission/de-novo-classification-request

[19] https://investors.dexcom.com/news/news-details/2018/FDA-Authorizes-Marketing-of-the-New-Dexcom-G6-CGM-Eliminating-Need-for-Fingerstick-Blood-Testing-for-People-with-Diabetes/

[20] *Id.*

[21] https://www.dexcom.com/en-GB/about-dexcom

[22] https://provider.dexcom.com/products/g6-personal-cgm

[23] https://www.dexcom.com/g6-cgm-system

[24] *See* https://ca.provider.dexcom.com/dexcom-g6; see also Shah VN, et al. Diabetes Technol Ther. 2018;20(6):428-33

used by the FDA and international standards bodies as the primary benchmark for CGM performance.

**2. The Dexcom G7**

43. On December 8, 2022, Defendant announced that its G7 GCM had received clearance from the FDA. In its press release, Defendant proclaimed that the G7 achieved "an overall MARD of 8.2%," and described the device as "the most accurate CGM cleared by the FDA."[25] Dexcom further emphasized that the G7 had "real-time connectivity that can drive integrated insulin delivery systems," "[p]roven . . . accuracy," and "[r]eal-time glucose readings." [26]

44. A few months later, on February 17, 2023, Dexcom launched the G7 sensor.[27] The G7 is also a Class II medical device.[28] Defendant advertised the difference between the G6 and G7 sensors as follows:

---

[25] https://investors.dexcom.com/news/news-details/2022/Dexcom-G7-Receives-FDA-Clearance-The-Most-Accurate-Continuous-Glucose-Monitoring-System-Cleared-in-the-U.S/default.aspx

[26] *Id.*

[27] https://investors.dexcom.com/news/news-details/2023/Dexcom-G7-Continuous-Glucose-Monitoring-System-Will-Be-Available-to-Medicare-Beneficiaries-at-Launch/

[28] *See* Dexcom's 2024 Annual Report, available at https://s201.q4cdn.com/758408164/files/doc_financials/2024/ar/dexcom-2024-annual-report.pdf




**What is the difference between Dexcom G7 and Dexcom G6?**
All CGMs have three components: A sensor, a transmitter, and a receiver. With Dexcom G6, these components are all separate. Dexcom G7 combines the sensor and transmitter into one device. The chart below shows additional differences between Dexcom G7 and Dexcom G6.

| | Dexcom G7 | Dexcom G6 |
|---|---|---|
| **Form Factor** | All-in-one sensor and transmitter (60% smaller than Dexcom G6[1]) | Separate sensor and transmitter |
| **Warm-up Time** | 30 minutes | 2 hours |
| **Accuracy**[2] | MARD 8.2% | MARD 9% |
| **Wear Length** | 10 days + 12-hour grace period | 10 days |
| **Wear Locations** | Ages 2-6: Back of upper arm and upper buttocks<br>Ages >7: Back of upper arm | Ages 2-17: Abdomen, upper buttocks<br>Ages >17: Abdomen |

*Figure 5*

45. All iterations of the Dexcom G7 consist of three primary components: a sensor and transmitter unit, an applicator, and a receiver or compatible smart device. The sensor applicator is a single-use, disposable device designed to insert the G7's small, flexible sensor filament just beneath the user's skin, typically on the back of the upper arm, where it measures glucose concentrations in the interstitial fluid surrounding the body's cells like the G6 sensor does. Once deployed, the applicator is removed and discarded, leaving the compact, all-in-one sensor and transmitter adhered to the skin. The transmitter within this combined unit then continuously converts electrochemical signals into digital glucose readings and wirelessly transmits those readings,

approximately every five minutes, to the user's smartphone, smartwatch, or dedicated receiver.




*Figure 6*

46. Defendant marketed – and continues to market – the Dexcom G7 sensor as a highly accurate and reliable device that could independently measure glucose levels without requiring confirmatory blood-glucose (fingerstick) testing to verify its readings:

- Dexcom G7 is accurate when your glucose is low or high, and when it's changing quickly."[29]

- "Accurate glucose numbers without fingersticks."[30]

- "The Dexcom G7 Continuous Glucose Monitoring (CGM) System sends accurate real-time glucose readings to your smartphone 24/7 so you can make diabetes management decisions with confidence."[31]

- "[T]he most accurate CGM system."[32]

---

[29] https://www.dexcom.com/accuracy

[30] *Id.*

[31] *Id.*

[32] https://www.dexcom.com/g7-overview

- "With the Dexcom G7 Continuous Glucose Monitoring (CGM) System, you can see your glucose and where it's headed in real-time[.]"[33]

- "Data you can act on."[34]

- "Real-time insights allow you to track your glucose trends and see how food, activity, and medication impact your levels so you can gain more control."[35]

- "Experience the power of real-time glucose insights[.]"[36]

- "The Dexcom G7 CGM System makes it easier to manage your diabetes and see real results."[37]

- "See your glucose numbers without fingersticks."[38]

- "A small wearable sends real time glucose readings right to your Dexcom G7 app or receiver. It shows you where you're at, . . . so you can make better diabetes management decisions in the moment."[39]

- "Dexcom G7 is our most powerful continuous glucose monitoring (CGM) system and also the most accurate CGM available. Period. Offering real-time glucose feedback and numerous partner connections, Dexcom G7 is designed for adults

---

[33] *Id.*

[34] *Id.*

[35] *Id.*

[36] https://www.dexcom.com/g7/how-it-works

[37] *Id.*

[38] *Id.*

[39] *Id.*

and children (2+ years) living with diabetes who are on insulin, or at risk for hypoglycemia."[40]

- "No fingersticks from day one. No guesswork."[41]
- "Dexcom G7: The most accurate CGM. Period."[42]
- "See your glucose levels anytime, anywhere."[43]
- "Accuracy that powers smarter insulin delivery."[44]
- "Dexcom G7 is our most powerful continuous glucose monitoring (CGM) system and also the most accurate CGM available. Period. Offering real-time glucose feedback and numerous partner connections, Dexcom G7 is designed for adults and children (2+ years) living with diabetes who are on insulin, or at risk for hypoglycemia."[45]
- "No fingersticks from day one. No guesswork."[46]
- "Dexcom G7: The most accurate CGM. Period."[47]

[40] https://www.dexcom.com/

[41] https://www.instagram.com/p/DP6m3UIgU-k/

[42] *Id.*

[43] *Id.*

[44] https://www.instagram.com/p/DQW8MN2EuZT/

[45] Andrew Ford, et al., "Dexcom's Fatal Flaws." Hunterbrook Media (Sept. 18,2025), available at https://hntrbrk.com/dexcom/

[46] *Id.*

[47] *Id.*

- "See your glucose levels anytime, anywhere."[48]

- "Accuracy that powers smarter insulin delivery."[49]

### C. Dexcom Puts "Profit Over Quality" by Changing the Design of the Modified CGMs without FDA Approval

47. In December 2023, Defendant made material design changes to the G6 and G7 without authorization by the FDA.

48. The pre-December 2023 Dexcom G6 and G7 design used a silicone-based compound supplied by a third-party manufacturer to coat the hair-thin sensor filament that measures glucose levels beneath the skin. This membrane coating serves a critical function: it acts as a chemical barrier that prevents interference from electroactive substances (e.g., acetaminophen), which can distort sensor readings. By filtering out such interference, the coating ensures the accuracy and stability of glucose measurements that users—including those who utilize insulin pumps that are integrated with the Dexcom G6 and G7—depend upon for precise insulin-dosing decisions.

49. In December 2023, without seeking FDA approval, Defendant replaced the original third-party coating that was contained in the approved G6 and G7 devices with an internally-manufactured formulation. According to FDA documents obtained and published by *Hunterbrook Media* in September 2025, Defendant's own validation testing demonstrated that this internally produced coating performed worse than the approved formulation across multiple accuracy metrics.

50. The FDA determined that FDA approval for this design change was required; this is unsurprising because, as previously noted, the Dexcom G6 and G7 are

---

[48] *Id.*

[49] *Id.*

Class II medical devices.[50] To that end, the FDA found that Defendant was required to apply for premarket approval before marketing and selling these altered devices pursuant to 21 U.S.C. § 360e(a).[51] Defendant could have done so by submitting a 510(k) premarket notification to the FDA for both devices. A 510(k) application is a regulatory filing that medical device manufacturers must submit to the FDA for premarket approval.

51. According to investigative reporting by *Hunterbrook Media*, Defendant implemented its undisclosed design change to the Modified CGMs' wiring coating primarily as a cost-cutting measure, *not* as a technological improvement.[52] Indeed, former employees of Defendant described it as having a "toxic culture that put profit above quality" and that "Dexcom compromised the [Modified CGMs] trying to 'hold on to large revenue margins" as competitors and GLP-1 drugs like Ozempic threatened Defendant's market share.[53]

52. On information and belief, the Modified CGMs with the undisclosed modification to their wiring coating have been sold to Plaintiff and Class Members since Dexcom implemented the design change, without FDA approval, in December 2023 and, to date, those modified sensors are still being sold to Plaintiff and Class Members.

**D. <u>Dexcom's Unauthorized Design Change Impacts Its Patients</u>**

53. Complaints about the accuracy of the Modified CGMs are prevalent in the FDA's Manufacturer and User Facility Device Experience ("MAUDE") database and on social media.

---

[50] https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfpmn/pmn.cfm?ID=K182041 (Dexcom G6 510(k)); https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfpmn/pmn.cfm?ID=K213919 (Dexcom G7 510(k)).

[51] https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/dexcom-inc-700835-03042025

[52] Andrew Ford, et al., "Dexcom's Fatal Flaws." Hunterbrook Media (Sept. 18,2025), available at https://hntrbrk.com/dexcom/

[53] *Id.*

54. The MAUDE database serves as a centralized repository for reports of adverse events involving medical devices. It compiles Medical Device Reports ("MDRs") submitted by manufacturers, importers, and user facilities, as well as voluntary reports from healthcare professionals, patients, and consumers. These reports contain information regarding device malfunctions, serious injuries, and deaths that may be associated with the use of medical devices. The FDA aggregates and publishes these submissions in the MAUDE database to monitor postmarket safety, identify potential product defects or design issues, and detect patterns of recurring problems. Data in MAUDE is compiled from mandatory and voluntary submissions under 21 C.F.R. Part 803 and is a key component of the agency's postmarket surveillance system and a critical source of public information about device safety and performance.

55. FDA data from MAUDE shows that complaints about the accuracy of Defendant's G6 and G7 sensors were far greater after Defendant implemented its unauthorized design change.




*A chart showing complaints for G7 devices manufactured after the manufacturing change draw far more accuracy-related complaints from users.* Source: Hunterbrook analysis of FDA MAUDE database

*Figure 7*[54]

56. Since the introduction of the Modified CGMs, Dexcom customers have been complaining about the accuracy of Dexcom's G6 and G7 sensors on social media too. Hunterbrook reported that "[a] Facebook group dedicated to G7 problems has exploded to 58,000 members in the past year."[55] These complaints include, but are not limited to, the following:[56]

- "I kept wondering why I felt so bad. And I read my dexcom and it said 190. I did my blood sugar on my index finger. And it was 39. It was very much almost dead at that point. I was passing out. Dexcom needs to fix this"[57]

- " I had this happen to me recently . . . my readings were 100's of points on told me I was in the 40's and dropping didn't feel like I was at all finger stick to calibration I was 389 if I would have corrected I would have been in the 500's. . . ."[58]

- "My dexcom kept saying low reading I kept trying to get it up and I felt real bad so I called medic rescue it was almost 400. And just took to hospital while I was in for a week and it never was right according to the finger sick 50 and more off"[59]

- "The current g7 sensor i am wearing, now on my 8th day has been off up to 50 points several times during the past 8 days. It reads higher than finger stick. Just now it reads 150 and finger stick was 109. I understand that at times the sensor

---

[54] Michelle Cera, *et al.*, "BREAKING: Three More Deaths Reported After Dexcom G7 Faults," Hunterbrook Media (Oct. 28, 2025), available at https://hntrbrk.com/dexcom2/.

[55] Andrew Ford, et al., "Dexcom's Fatal Flaws." Hunterbrook Media (Sept. 18, 2025), available at https://hntrbrk.com/dexcom/.

[56] https://www.facebook.com/groups/1539517486772872 (last accessed Oct. 30, 2025).

[57] https://www.facebook.com/groups/1539517486772872/posts/1899031457488138/

[58] *Id.*

[59] *Id.*

may be off, but all the time? I stick myself about 6 times a day and it's always much lower than the sensor. . . ."[60]

57. Since the Modified CGMs were introduced, Instagram users have lodged myriad complaints from its customers on Dexcom's Instagram account, including, but not limited to, the following:

- "My g7 would say 'low' but my blood stick test would say 500 how is that okay? []"[61]

- "I am about to loose my mind. Every single solitary G6 is failing dangerously lately for us. I hate for my kids to not have them. I know they have worked in the past but this is so so so scary. I am afraid life threatening errors. When they fail it's annoying. However recently they are just flat out wrong wrong like hundreds off points off every one of them. . . ."[62]

- ". . . . we are constantly having issues where the CGM is 30-60 higher than BGM [(blood glucose monitor)]. . . . this can be extremely dangerous especially on a pump. []"[63]

---

[60] https://www.facebook.com/groups/1539517486772872/posts/1899016664156284/

[61] https://www.instagram.com/p/DOoN9pzEXKL/

[62] *Id.*

[63] *Id.*

58. Reddit users too have complained about the accuracy of Dexcom's G6 and G7 sensors. For example:




*Figure 8*[64]

59. Other recent complaints on Reddit include, but are not limited to, the following:

- "The G7 GCM system is seriously dangerous. The constant inaccurate readings on the extreme ends of the blood sugar scale are unbelievable. The G7 has told me constantly that I am around 40-45 when my BS is 90-100.

  Just today, the G7 was reading 300+ so my Omnipod gave me the appropriate amount of insulin to compensate and bring me back down to normal levels. It turned out my BS was actually 134.

  This can seriously kill someone. If someone didn't have access to enough carbs to cover the insulin they could die. Just due to the failure of the G7."[65]

---

[64] https://www.reddit.com/r/dexcom/comments/1obmcui/class_action_lawsuit_g7/

[65] https://www.reddit.com/r/dexcom/comments/1ocqw6l/i_do_not_recommend_using_the_dexcom_g7_the_lack/

- "It's 2 AM. My sensor has been blasting out mind bogglingly loud URGENT LOW READINGS notifications for the second night in a row. I finger pricked and was 70, not the 48 it was suggesting. Now it is saying I'm 61 with double down arrows and a finger prick says Im 100. I turned off my sensor app last night as the data was so inaccurate. I pay hundreds of dollars out of pocket for this comically inaccurate products. I follow all the rules, have been a T1D for 20+ years.

  The amount of times that my sensors are off by 40-70 points is comical. If I was half as inaccurate as my sensors when it came to putting together presentations for work I would be fired. How the f*** are these products FDA approved when it seems that 1/2 of every sensor can consistently provide accurate data? I wear the sensors where recommended, following all the steps."[66]

- "My son wears the G7 and has had a 40 point difference (dex reading higher than manual). We didn't know this until he experienced a severe low Thursday morning and it was so severe, I called 911. His dexcom was reading 70, dropped to 50 in 10 minutes, so his actual glucose was in the teens. It made him sick, so he couldn't take in any sugar to raise his BG. This was so scary and taught us to not fully trust the dexcom. This particular one was from a new medical supplier and was the first one from the set we had just received. Now I'm worried the entire 3 month supply is going to be like this. We will be doing manual checks against it often and calibrate. He also has a pump, so it must have given too much insulin due to the dex reading 40 points higher than manual. Now he's afraid to use the pump and so am I."[67]

---

[66] https://www.reddit.com/r/dexcom/comments/1czenl3/anyone_else_struggle_with_accuracy_regularly/

[67] https://www.reddit.com/r/dexcom/comments/1kytqmt/dexcom_g7_inaccurate/

### E. The FDA Issues a Warning Letter to Defendant about its "Adulterated" G6 and G7 Sensors

60. The FDA conducted investigations of Defendant's facilities in San Diego, California from October 21, 2024 through November 7, 2024, and Mesa, Arizona from June 10, 2024 through June 14, 2024.[68]

61. On June 14, 2024 and November 7, 2024, the FDA issued to Defendant two separate Form 483s that listed the FDA's observations from these investigations. A Form 483 "is issued to firm management at the conclusion of an inspection when an investigator(s) has observed any conditions that in their judgment may constitute violations of the Food Drug and Cosmetic (FD&C) Act and related Acts."[69] This form "notifies the company's management of objectionable conditions. . . . [and] is presented and discussed with the company's senior management."[70] Per the FDA, "[c]ompanies are encouraged to respond to the FDA Form 483 in writing with their corrective action plan and then implement that corrective action plan expeditiously."[71]

62. The FDA then issued a Warning Letter to Defendant on March 4, 2025, because of "deficiencies in the response letters sent by the Company to the FDA following the Form 483."[72] Per the FDA:

> The FDA then issued a Warning Letter to Defendant on March 4, 2025, because of "deficiencies in the response letters sent by the Company to the FDA following the Form 483." Per the FDA: A Warning Letter is a correspondence that notifies regulated industry about violations that FDA has documented during its inspections or investigations. Typically, a Warning Letter notifies a responsible individual or firm that the Agency considers one or more products, practices,

---

[68] https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/dexcom-inc-700835-03042025

[69] https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/inspection-references/fda-form-483-frequently-asked-questions

[70] *Id.*

[71] *Id.*

[72] https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/dexcom-inc-700835-03042025; see also https://www.sec.gov/Archives/edgar/data/1093557/000109355725000047/dxcm-20250304.htm.

processes, or other activities to be in violation of the Federal Food, Drug, and Cosmetic Act (the Act), its implementing regulations and other federal statutes. Warning Letters should only be issued for violations of regulatory significance, i.e., those that may actually lead to an enforcement action if the documented violations are not promptly and adequately corrected. A Warning Letter is one of the Agency's principal means of achieving prompt voluntary compliance with the Act.[73]

63. In its March 4, 2025 Warning Letter, the FDA determined that the Modified CGMs are "adulterated within the meaning of section 501(h) of the Act, 21 U.S.C. § 351(h), in that the methods used in, or the facilities or controls used for, their manufacture…are not in conformity with" the Quality System Regulation (21 C.F.R. Part 820).

64. Specifically, the FDA found that Defendant had implemented a "significant" design change to a "critical" component used in the Modified CGMs' resistance coating. The modification involved replacing the component—originally sourced from a third-party—with the Substitute Component that Defendant manufactured. The FDA determined Dexcom had not validated this change through appropriate studies assessing safety, performance, and effectiveness, and that its in-house component showed greater variability and lower accuracy than the externally sourced component used in the cleared versions.

65. According to the Warning Letter, Defendant "modified the [Modified CGMs] by replacing" this "critical" component even though these sensors had been cleared in Defendant's original 510(k) applications with the original component. The FDA explained that the "pivotal clinical studies submitted" in Defendant's original 510(k) applications used the original components, which were "critical" to device performance, and concluded that the company's unreported modifications constituted major changes requiring a new premarket notification.

66. The FDA also cited Dexcom for failures in design verification and validation procedures, noting that the company's hazard analyses and risk assessments

[73] https://web.archive.org/web/20110411224532/http://www.fda.gov/downloads/ICECI/ComplianceManuals/RegulatoryProceduresManual/UCM176965.pdf; see also https://www.fda.gov/media/71878/download.

did not account for the foreseeable dangers of inaccurate glucose readings, particularly when the CGM is integrated with insulin pumps for an automated insulin-delivery ("AID") system. The agency concluded that Dexcom's testing did not adequately demonstrate that the Modified CGMs devices could provide reliable glucose data under real-world conditions, exposing insulin-dependent users to the risk of overdosing or underdosing insulin based on erroneous sensor readings.

67. As mentioned in the FDA in its Warning Letter, inaccurate glucose readings from the Modified CGMs can have serious and, indeed, life-threatening consequences for its user. Indeed, if the device falsely reports a normal or high glucose level when blood sugar is actually low, a person may fail to treat hypoglycemia by consuming carbohydrates or even administer insulin; this risks seizures, loss of consciousness, coma, or death. Conversely, if the device incorrectly shows a low reading, a user can consume carbohydrates without administering an appropriate dose of insulin, leading to dangerously high blood sugar and potentially long-term complications. Because insulin dosing decisions are typically based on CGM readings, accuracy is critical to maintaining safe glucose control and avoiding acute and chronic complications of diabetes.

68. Some users of the Modified CGMs have faced serious consequences from the sensors' inaccuracies. A September 2025 *Hunterbrook* investigation and a follow-up October 28, 2025 *Hunterbrook* article reported on certain individuals who were hospitalized or died following inaccurate glucose readings from Defendant's sensors.[74]

## V. PLAINTIFF'S EXPERIENCE

69. At all relevant times, Plaintiff Dalora paid, and continues to pay, copays for a ninety-day supply of Dexcom CGM sensors. These sensors were prescribed to Plaintiff by her doctor, and she has been using Dexcom sensors since 2019. On

[74] Michelle Cera, et al., "BREAKING: Three More Deaths Reported After Dexcom G7 Faults," Hunterbrook Media (Oct. 28, 2025), available at https://hntrbrk.com/dexcom2/; Andrew Ford, et al., "Dexcom's Fatal Flaws." Hunterbrook Media (Sept. 18, 2025), available at https://hntrbrk.com/dexcom/.

information and belief, many of the Dexcom CGM sensors purchased by Plaintiff were Modified CGMs.

70. Plaintiff paid and continues to pay $160 copays for these sensors to Byram Healthcare, a medical supply company, beginning around late August and early September of 2025. Prior to that, Plaintiff paid $90 copays for these sensors to Express Scripts.

71. Before purchasing the Dexcom sensors, Plaintiff saw and relied upon advertisements containing Defendant's misrepresentations concerning the accuracy of Dexcom's G6 and G7 sensors and their FDA approval.

72. The Dexcom sensors that Plaintiff purchased failed to perform as advertised or warranted and were, as the FDA has determined, adulterated, misbranded, and unlawfully marketed by Dexcom.

73. Plaintiff has checked the accuracy of her Dexcom sensors with a blood glucose test—sometimes multiple times a day—because her symptoms have not aligned with the reading from her Dexcom sensor.

74. Plaintiff has repeatedly received blood glucose test results that have strongly deviated from the readings on her Dexcom sensors since Defendant implemented its FDA-unapproved design change to a "critical" component of its sensors. For example, Plaintiff received readings from her Dexcom sensor and a blood glucose test using a fingerstick and a glucometer that revealed discrepancies of over 100 mg/dl.

75. Plaintiff would not have purchased the Dexcom G6 and G7 sensors, or would have paid significantly less for them, had Defendant disclosed the Modified CGMs were not FDA-approved and were prone to giving inaccurate readings.

## VI. <u>CLASS ALLEGATIONS</u>

76. Plaintiff brings this case as a class action under Federal Rules of Civil Procedure 23(b)(2), (b)(3), and (c)(4) on behalf of a Nationwide Class and New Jersey Sub-Class, defined as follows:

**Nationwide Class**

All persons in the United States who purchased one or more Modified CGMs.

**New Jersey Subclass**

All persons in the State of New Jersey who purchased in New Jersey one or more Modified CGMs.

77. Members of the proposed Classes are readily ascertainable because the class definitions are based on objective criteria.

78. Plaintiff reserves the right to revise the class definitions after conducting discovery and further investigation.

79. **Numerosity (Fed. R. Civ. P. 23(a)(1))**: The Classes are each so numerous that joinder of all members is impracticable. On information and belief, the Classes each have more than 1,000 members. The parties will be able to identify members of the Classes and the exact size of the Classes through discovery and Dexcom's records.

80. **Commonality and Predominance (Fed. R. Civ. P. 23(a)(2); 23(b)(3))**: Common questions of law and fact exist for each of the claims and predominate over questions affecting only individual members of the Classes. Common questions of law and fact include:

a. Whether Dexcom manufactured, distributed, or sold G6 and G7 sensors with a design change without FDA premarket notification and clearance;

b. Whether that undisclosed and unapproved change reduced the sensors' accuracy and reliability;

c. Whether Dexcom's statements about the performance, accuracy, and regulatory status of its Modified CGMs were false or misleading;

d. Whether a reasonable consumer would find the undisclosed and unapproved change and its impact material;

e. Whether Dexcom's omissions and misstatements were likely to deceive a reasonable consumer;

f. Whether Defendant engaged in a common course of conduct towards Plaintiff and Class members;

g. Whether Dexcom's failure to obtain required clearance breached express or implied warranties and violated consumer-protection statutes;

h. Whether Dexcom was unjustly enriched by selling modified sensors without required FDA clearance;

i. Whether purchasers of modified sensors paid a price premium and suffered economic loss;

j. Whether purchasers paid a price premium for the Modified CGMs sensors based on Defendant's representations about FDA clearance and accuracy;

k. Whether purchasers would have purchased the Modified CGMs had they known they were not FDA-approved and/or contained faulty and/or inaccurate sensors; and

l. Whether Plaintiff and Class members are entitled to relief, including damages and equitable relief.

81. Defendant has engaged in a common course of conduct toward Plaintiff and other Class members. The common issues arising from this conduct that affect Plaintiff and other Class members predominate over any individual issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy

82. **Typicality (Fed. R. Civ. P. 23(a)(3))**: Plaintiff's claims are typical of the Classes' claims because they arise from the same course of conduct by Dexcom, and she seeks relief that is common to all Class members. Plaintiff, like all Class members, purchased and used Dexcom G6 and G7 sensors that were not cleared by the FDA and that Dexcom represented as providing the most accurate blood-sugar readings.

83. **Adequacy of Representation (Fed. R. Civ. P. 23(a)(4))**: Plaintiff will fairly and adequately protect the interests of the Classes. Plaintiff has retained competent and capable attorneys with significant experience in complex and class action litigation. Plaintiff and her counsel are committed to prosecuting this action vigorously on behalf of the Classes and have the financial resources to do so. Neither Plaintiff nor her counsel has interests that are adverse to or that conflict with those of the proposed Classes.

84. **Superiority (Fed. R. Civ. P. 23(b)(3))**: A class action is the superior method for the fair and efficient adjudication of this controversy. Class members have little interest in individually controlling the prosecution of separate actions; concentrating the claims will avoid inconsistent judgments and conserve resources; and class management will be straightforward because Dexcom's records and public data will identify Class members and support common proof.

85. A class action is appropriate under Fed. R. Civ. P. 23(b)(2) because Defendant has acted or refused to act on grounds that apply generally to Class members, so that final injunctive relief or corresponding declaratory relief is appropriate as to all Class members.

**FIRST CLAIM FOR RELIEF**
**Unlawful and Unfair Business Practices**
**Cal. Bus. & Prof. Code § 17200, *et seq*.**
**On Behalf of Plaintiff and the Class**

86. Plaintiff realleges and incorporates by reference all preceding factual allegations found in paragraphs 1 through 85.

87. Defendant engaged in unlawful, unfair, and fraudulent business practices under California's UCL by secretly changing a key resistance-layer component in its Modified CGM without FDA clearance, then marketing and selling those modified devices as "FDA-approved" and "accurate." In fact, the modified sensors were less accurate and reliable than the cleared designs.

88. Defendant unlawfully marketed and sold its G6 and G7 continuous glucose monitoring sensors after making an undisclosed design change to a key resistance-layer component—without obtaining FDA clearance. The modified sensors performed worse in terms of accuracy and reliability than the FDA-approved designs.

89. Dexcom's conduct was unlawful because it violated:

a. the California Sherman Food, Drug, and Cosmetic Law, Cal. Health & Safety Code § 111440 (prohibiting sale of misbranded medical devices);

b. the Federal Food, Drug, and Cosmetic Act (21 U.S.C. §§ 331, 352, 351);

c. the False Advertising Law, Cal. Bus. & Prof. Code § 17500, *et seq*.; and

d. the Consumers Legal Remedies Act, Cal. Civ. Code § 1750, *et seq*.

90. Dexcom's conduct was unfair because:

a. the gravity of harm to consumers far outweighs any conceivable utility;

b. the conduct was immoral, unethical, oppressive, and substantially injurious to consumers who relied on Defendant's promises of "best-in-class accuracy" and "FDA-approved"; and

c. the injuries were not reasonably avoidable by consumers lacking access to internal FDA correspondence or Defendant's testing data.

91. Dexcom's conduct was fraudulent within the meaning of the UCL because its advertising and product labeling misled reasonable consumers into believing that the Modified CGMs were FDA-approved, accurate, and reliable, while concealing the unauthorized design change and degraded performance.

92. As a direct result of Defendant's unlawful and unfair practices, Plaintiff and Class members paid for medical devices that have been determined to be "misbranded," and "adulterated," and that were less accurate than represented. Plaintiff and Class members suffered ascertainable losses and overpaid for inaccurate products that the FDA has stated do not have premarket approval; Class members would either not have purchased, or would have purchased these devices at a lower price had the truth been disclosed.

93. Plaintiff and Class members seek restitution, disgorgement of ill-gotten gains, injunctive relief to prevent further misconduct, and reasonable attorneys' fees and costs under Cal. Code Civ. Proc. § 1021.5.

**SECOND CLAIM FOR RELIEF**
**Violation of the California False Advertising Law**
**Cal. Bus. & Prof. Code § 17500, *et seq*.**
**On Behalf of Plaintiff and the Class**

94. Plaintiff realleges and incorporates by reference all preceding factual allegations found in paragraphs 86 through 93.

95. California's False Advertising Law prohibits any statement or omission in connection with the sale of goods "which is untrue or misleading." Cal. Bus. & Prof. Code §17500.

96. Dexcom's national campaign—television, online ads, packaging, and physician outreach—touted the G6 and G7 sensors as "FDA-approved" and "accurate" and continued to do so with respect to the Modified CGMs. Those statements were false or misleading with respect to the Modified CGMs because Dexcom changed the sensors' design without FDA clearance, knew the Modified CGMs sensors performed worse, and failed to disclose that they were adulterated and misbranded. Plaintiff and Class members reasonably relied on these representations and omissions and overpaid for the products, suffering economic injury.

97. Defendant knew or should have known that these statements were untrue and that consumers would rely on them in deciding to purchase the products. Plaintiff and Class members reasonably relied on these representations and omissions and were thereby induced to purchase or overpay for the Modified CGMs.

98. As a direct and proximate result of Defendant's violations of § 17500, Plaintiff and Class members suffered economic injury, including payment of the purchase price and loss of the benefit of the bargain.

99. Defendant's conduct is ongoing and continuing, such that prospective injunctive relief is necessary, especially given Plaintiff's and Class members' desire to purchase these products in the future if they can be assured that Modified CGMs are as advertised: "FDA-approved" and "accurate."

100. Plaintiff and Class members are entitled to injunctive and equitable relief, and restitution in the amount they spent on the Dexcom G6 and G7 sensors.

**THIRD CLAIM FOR RELIEF**
**Violation of the California Consumers Legal Remedies Act**
**Cal. Civ. Code § 1750, *et seq*.**
**On Behalf of Plaintiff and the Class**

101. Plaintiff realleges and incorporates by reference all preceding factual allegations found in paragraphs 94 through 100.

102. Defendant is a "person" under Cal. Civ. Code § 1761(c) and sold "goods" within the meaning of § 1761(a). Plaintiff and Class members are "consumers" under §

1761(d), and their purchases of the G6 and G7 sensors constitute "transactions" within the meaning of § 1761(e).

103. Defendant violated Cal. Civ. Code § 1770(a) by:

a. representing that its products had characteristics, uses, and benefits they did not have (§ 1770(a)(5));

b. advertising goods with intent not to sell them as advertised (§ 1770(a)(9));

c. representing that goods were of a particular standard or quality when they were not (§ 1770(a)(7));

d. misrepresenting that transactions conferred rights or remedies that they did not (§ 1770(a)(14)); and

e. representing that goods were supplied in accordance with prior representations when they were not (§ 1770(a)(16)).

104. Defendant failed to disclose that the G6 and G7 sensors were sold without FDA clearance, were adulterated and misbranded, and produced inaccurate glucose readings that could endanger users. Dexcom intended that consumers rely on these omissions and did so to increase sales and profit margins.

105. Had Plaintiff and Class members known the truth, they would not have purchased the sensors or would have paid far less for them. Plaintiff provided pre-suit notice under Cal. Civ. Code § 1782(a) and seeks injunctive relief under 1780(a)(2) to bar further misrepresentations or omissions about clearance and accuracy. If Dexcom fails to correct its conduct, Plaintiff and Class members will also seek damages under § 1780(a).

**FOURTH CLAIM FOR RELIEF**
**Violation of the New Jersey Consumer Fraud Act**
**N.J.S.A. § 56:8-1, *et seq.***
**On behalf of Plaintiff, the Class, and the New Jersey Subclass**

106. Plaintiff realleges and incorporates by reference all preceding factual allegations found in paragraphs 101 through 105.

107. Defendant and Plaintiff are "person[s]" as that term is defined by the New Jersey Consumer Fraud Act ("CFA"), N.J.S.A. 56:8-1(d).

108. Defendant's conduct as alleged herein related to "sales" or "offers for sale," as defined by N.J.S.A. 56:8-1.

109. The CFA prohibits "the act . . . of any commercial practice that is unconscionable or abusive, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice. . . ." N.J. Stat. Ann. § 56:8-2.

110. Defendant's acts and practices related to the manufacturing, distribution, marketing, and sale of the Modified CGMs that did not receive premarket FDA approval and contain faulty and/or inaccurate sensors constitute unconscionable and misleading commercial practices.

111. Defendant advertised, offered, or sold goods or services in New Jersey and engaged in trade or commerce directly or indirectly affecting the citizens of the State of New Jersey.

112. Defendant solicited Plaintiff and Class members to do business and uniformly and knowingly misrepresented that the Modified CGMs were "FDA-approved" and "accurate" medical devices.

113. Defendant intended to mislead Plaintiff and Class members and induce them to rely on their misrepresentations and omissions.

114. Defendant's practices also contravene FDA regulations that seek to protect consumers.

115. Due to Defendant's specific and superior knowledge regarding the design of the Dexcom G6 and G7, its false representations regarding FDA approval and the accuracy of the Modified CGMs, and reliance by Plaintiff and Class members on these material misrepresentations, Defendant had a duty to disclose to Plaintiff and Class members that it had made material design changes to the Dexcom G6 and G7 that were unapproved by the FDA and impacted the accuracy of these devices.

116. Defendant's acts and omissions, as set forth herein, evidence a lack of good faith, honesty in fact and observance of fair dealing, so as to constitute unconscionable and misleading commercial practices, in violation of N.J.S.A. 56:8-2.

117. As a direct and proximate result of Defendant's unfair and deceptive acts and practices, Plaintiff and Class members suffered an ascertainable loss of money or personal property because they purchased more Dexcom G6 or G7 sensors than they otherwise would have or paid prices they would not otherwise have paid.

118. Defendant's violations present a continuing risk to Plaintiff and Class members as well as to the public. Defendant's unlawful acts and practices complained of herein affect the public interest.

119. Plaintiff and Class members seek all monetary and non-monetary relief allowed by law, including damages, disgorgement, injunctive relief, and attorneys' fees and costs.

**FIFTH CLAIM FOR RELIEF**
**Breach of Express Warranty**
**Cal. Com. Code § 2313**
**On behalf of Plaintiff and the Class**

120. Plaintiff realleges and incorporates by reference all preceding factual allegations found in paragraphs 106 through 119.

121. Defendant is and was at all relevant times a "merchant" with respect to the Modified CGMs under Cal. Com. Code § 2104(1) and a "seller" of the Modified CGMs under § 2103(1)(d).

122. Plaintiff and Class members who purchased the Modified CGMs are "buyer[s]" within the meaning of Cal. Com. Code § 2103(1)(a).

123. The Modified CGMs are and were at all relevant times "goods" within the meaning of Cal. Com. Code § 2105(1).

124. Defendant made affirmations of fact or promises to Plaintiff and Class members, which relate to the Modified CGMs, as alleged herein, that became part of the basis of the bargain creating an express warranty that the Modified CGMs would conform to the affirmations or promises. Cal. Com. Code § 2313(1)(a).

125. Defendant made these statements or advertisements on Defendant's website, television commercials, social media accounts, product packaging, product labels, and/or package inserts.

126. Plaintiff and Class members relied on and/or reviewed and viewed these statements or advertisements made by Defendant in choosing to purchase the Modified CGMs.

127. Defendant breached this warranty by manufacturing, distributing, and selling to Plaintiff and Class members the Modified CGMs that did not conform with the affirmations of fact or promises alleged herein. As a result, Plaintiff and Class members did not receive the benefit of their bargain.

128. As a direct and proximate result of Defendant's breach of its express warranties, Plaintiff and Class members are entitled to legal and equitable relief against Defendant, including damages, attorneys' fees, costs of suit, and other relief as appropriate.

**SIXTH CLAIM FOR RELIEF**
**Unjust Enrichment**
**On behalf of Plaintiff, the Class, and the New Jersey Subclass**

129. Plaintiff realleges and incorporates by reference preceding factual allegations found in paragraphs 120 through 128.

130. Plaintiff brings this Claim for Relief on behalf of themselves and the Class and New Jersey Subclass under New Jersey law and do so in the alternative to any Counts brought for legal remedies and expressly allege that for purposes of this Count they lack adequate remedies at law.

131. Even though Plaintiff and Class members have no direct contractual relationship with Defendant, Plaintiff and Class members conferred a benefit upon Defendant by purchasing Modified CGMs that contained the FDA-unapproved design change. Although pharmacies and other medical providers sold these sensors to Plaintiff and Class members, Defendant profits from the sale of each sensor. Plaintiff and Class members paid Defendant for the Modified CGMs in amounts that were higher than

Defendant would have sold them if Defendant disclosed its FDA-unapproved design change that impacted the devices' accuracy.

132. Defendant knew that these improper benefits were conferred on it.

133. Defendant, having received these benefits, is required to provide remuneration under the circumstances. It is unjust for Defendant to retain such monies obtained by the illegal conduct described above. Such money or property belongs in good conscience to Plaintiff and Class members and can be traced to funds or property in Defendant's possession. Plaintiff's and Class members' detriment and Defendant's enrichment are related to and flow from the conduct challenged in this Complaint.

134. Plaintiff and Class members are entitled to all available restitution and disgorgement of revenues, as it would be inequitable and unjust for Defendant to retain such benefits. Other remedies and claims may not permit them to obtain such relief, leaving them without an adequate remedy at law.

## SEVENTH CLAIM FOR RELIEF
**Violations of the Song-Beverly Consumer Warranty Act**
**for Breach of Express Warranties**
**Cal. Civ. Code § 1790, *et seq*.**
**On Behalf of Plaintiff and the Class**

135. Plaintiff realleges and incorporates by reference preceding factual allegations found in paragraphs 129 through 134.

136. Defendant expressly warranted, through its labeling, marketing, and public statements, that the Modified CGMs were "FDA-approved" and "accurate." These statements formed part of the basis of the bargain between Defendant and consumers.

137. Defendant breached these express warranties by selling devices that (a) were not cleared by the FDA, (b) were adulterated and misbranded, and (c) failed to perform as represented. The modified sensors were materially less accurate and reliable than the FDA-approved versions and were not suitable for their intended medical purpose of continuously monitoring glucose levels with precision.

138. As a direct and proximate result of Defendant's breaches, Plaintiff and Class members purchased defective devices, sustained monetary losses, and were deprived of the benefit of their bargain.

139. Defendant's failure to provide conforming replacement devices or refunds constitutes a further violation of Cal. Civ. Code § 1793.2. Plaintiff and Class members are entitled to restitution, actual damages, civil penalties up to two times actual damages, attorneys' fees, and costs.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff and Class members demand judgment as follows:

A. Certification of the action as a Class Action Pursuant to Federal Rule of Civil Procedure 23, and appointment of Plaintiff as Class Representative and her counsel of record as Class Counsel;

B. That acts alleged herein be adjudged and decreed to constitute breach of express warranty, unjust enrichment, and violations of the consumer protection laws of California and New Jersey;

C. A judgment against Defendant for the damages sustained by Plaintiff and the Classes defined herein, and for any additional damages, penalties, and other monetary relief provided by applicable law;

D. An order providing injunctive and other equitable relief as necessary to protect the interests of the Classes, including, but not limited to:

1. An order enjoining Defendant from manufacturing, distributing, or selling Dexcom G6 and G7 sensors that do not have FDA premarket approval;

2. An order enjoining Defendant from selling any Modified CGMs in any manner that suggests or implies that Defendant has regulatory approval to do so or that the Modified CGMs are "accurate";

3. An order requiring Defendant to engage in a corrective advertising campaign and engage in any further necessary affirmative injunctive relief, such as recalling existing products;

4. An order awarding declaratory relief, and any further retrospective or prospective injunctive relief permitted by law or equity, including enjoining

Defendant from continuing the practices alleged herein, and injunctive relief to remedy Defendant's past conduct;

5. An order requiring Defendant to pay restitution to restore all funds acquired by means of any act or practice declared by this Court to be an unlawful, unfair, or fraudulent business act or practice, untrue or misleading advertising, or a violation of law;

6. An order requiring Defendant to disgorge or return all monies, revenues, and profits obtained by means of any wrongful or unlawful act or practice; and

7. An order requiring Defendant to pay all actual and statutory damages permitted under the counts alleged herein.

E. By awarding Plaintiff and Class members pre-judgment and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of the Complaint in this action;

F. The costs of this suit, including reasonable attorneys' fees; and

G. Such other and further relief as the Court deems just and proper.

## VIII. DEMAND FOR JURY TRIAL

Plaintiff, individually and on behalf of all those similarly situated, hereby requests a jury trial, pursuant to Federal Rule of Civil Procedure 38, on any and all claims so triable.

Dated: November 18, 2025

**CASEY GERRY FRANCAVILLA BLATT LLP**

*/s/ David S. Casey, Jr.*

David S. Casey, Jr., SBN 060768
Gayle M. Blatt, SBN 122048
P. Camille Guerra, SBN 326546
110 Laurel Street
San Diego, CA 92101
Telephone: (619) 238-1811
Facsimile: (619) 544-9232
dcasey@cglaw.com

gmb@cglaw.com
camille@cglaw.com

**LITE DEPALMA GREENBERG & AFANADOR, LLC**
Joseph J. DePalma (*pro hac vice* application forthcoming)
Catherine B. Derenze (*pro hac vice* application forthcoming)
570 Broad St., Suite 1201
Newark, NJ 07102
Telephone: (973) 623-3000
Facsimile: (973) 623-0858
jdepalma@litedepalma.com
cderenze@litedepalma.com

**HAUSFELD LLP**
James J. Pizzirusso (*pro hac vice* application forthcoming)
Timothy S. Kearns (*pro hac vice* application forthcoming)
John Thompson (*pro hac vice* application forthcoming)
1200 17th St. NW, Suite 600
Washington, D.C. 20036
Telephone: (202) 540-7200
Facsimile: (202) 540-7201
jpizzirusso@hausfeld.com
tkearns@hausfeld.com
jthompson@hausfeld.com

Steven M. Nathan (California Bar No. 153250)
33 Whitehall St., 14th Floor
New York, NY 10004
Telephone: (646) 357-1100
Facsimile: (212) 202-4322
snathan@hausfeld.com

*Counsel for Plaintiff and the Putative Class and Subclass*